## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**SALEM MAULUD ABOULGAED,**
**Legal representative of**
**Dr. Fathi Salim Mawloud Aboulqaed,**
**Jamal Abdelnasar Street**
**Az-Zawiyah, Libya**

**And**

**KHAYRI ALFAYTOURI MOHAMMED NASRAT**
**Legal representative of**
**Dr. Aws Khayri Alfaytouri Nasrat,**
**17 February Street**
**Az-Zawiyah, Libya**

**And**

**MISBAH ABDULLAH SALIM NASRAT**
**Legal representative of paramedic**
**Muath Misbah Abdullah Nasrat,**
**17 February Street**
**Az-Zawiyah, Libya**

**And**

**SALAHEDIN ALI ABDULSALAM RAHOMA,**
**Legal representative of paramedic**
**Mohammed Salahedin Ali Abdulsalam,**
**Al Ain Street**
**Surman, Libya**

**And**

**ABDULHAMID ALHADI ABDULHAMID BIN SALIH,**
**Legal representative of paramedic**
**Abraheem Ali Alhadi Bin Salih,**
**Omar Al Mukhtar Street**
**Az-Zawiyah, Libya**

**RIYADH NATHIM MOHAMMED ALAKHDHAR**
**Salah ad-Din Ayyubi Street**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
) Civil Action No.
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Az-Zawiyah, Libya                                    )
                                                     )
                                                     )
        Plaintiffs,                                  )
                                                     )
        v.                                           )
                                                     )
                                                     )
**KHALIFA ABULGASIM HIFTER**                         )
**(a.k.a KHALIFA ABULGASIM HAFTER),**                )
**5505 Seminary Road, Unit 213**                     )
**Arlington, VA 22201**                              )
                                                     )
**And**                                              )
                                                     )
**SAQR ADAM GEROUSHI**                               )
**Tripoli, Libya**                                   )
                                                     )
**And**                                              )
                                                     )
**UNITED ARAB EMIRATES (UAE)**                       )
**3522 International Ct NW #100**                     )
**Washington, D.C. 20008**                           )
                                                     )
**And**                                              )
                                                     )
**DR. AREF ALI NAYED**                               )
**Office 0114**                                      )
**Ibn Battuta Gate**                                 )
**P.O. BOX 502221**                                  )
**Dubai, United Arab Emirates**                      )
                                                     )
**And**                                              )
                                                     )
**MOHAMOUD AL-WERFALLI**                             )
**Benghazi, Libya**                                  )
                                                     )
        Defendants.                                  )
                                                     )
                                                     )

## <u>INTRODUCTION</u>

COME NOW the Plaintiffs named herein and through counsel hereby complain about the

Defendants as follows. These claims are brought pursuant to the Alien Tort Statute 28 U.S.C. §

1350, et. seq. (hereinafter "ATS") and the Torture Victim Protection Act 28 U.S.C. § 1350, et.

seq. (hereinafter "TVPA"). As detailed herein, Plaintiffs complain that the Defendants have

encouraged, ordered, and/or engaged in criminal conduct which constitutes war crimes, i.e.

extrajudicial killings and torture. This inhumane conduct violates the Fourth Geneva Convention,

the United Nations Charter, the Universal Declaration of Human Rights, and also the Law of

Nations Clause in the U.S. Constitution. *See* Art. I Sec. 8 Cl. 10.

Plaintiffs have no remedy to pursue in Libya for a number of reasons. Key institutions,

most notably the judiciary, are dysfunctional in most parts of the country and basic services have

collapsed. However, since the Plaintiffs are all foreign nationals, they can access U.S. courts as a

result of the Alien Tort Statute. As described herein, the Plaintiffs have explained why they

satisfy "the touch and concern test" *See Doe v. Exxon Mobil Corp*, 654 F.3d 11 (D.C. Cir. 2011).

They ask for a jury trial which would not be possible in the state of Libya.

Amnesty International has confirmed the temporary collapse of the Libyan judicial

system. In its written statement on the High Commissioner's Report on Libya, Amnesty stated

that: "Libya's domestic judicial system is highly dysfunctional and is unable to provide recourse

for victims of human rights violations or bring those responsible for these abuses to justice.

Perpetrators of serious human rights abuses continue to operate with absolute impunity without

fear of accountability."

The Plaintiffs believe that by filing this lawsuit in Washington, D.C. they will not only be

able to secure justice, but also bring to light the serious human rights abuses which the

Defendants have engaged in with absolute impunity and without fear of accountability.

As explained in the lawsuit, individuals like Defendants Geroushi, Nayed and Al-

Werfalli are responsible for the extra judicial killings and torture that they have committed at the

specific direction of Defendant Hifter. UN resolutions have made perfectly clear, and Amnesty International pronouncements have shown that it would be a grave miscarriage of justice if Defendants Geroushi, Nayed, and Al-Werfalli were allowed to claim immunity because they were simply following orders given by Defendant Hifter.  As this Court knows, that argument was rejected at the 1945 Nuremberg trials.

## **JURISDICTION**

1. 28 U.S.C. § 1331 is invoked on behalf of the non-U.S. citizen Plaintiffs against all Defendants in connection with Counts One through Five. These Counts fall under the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATS"). This Court has jurisdiction under the ATS to adjudicate Plaintiffs' claims because they: (a) involve violations of Customary International Law (extrajudicial killings and torture); (b) violate the Law of Nations clause in the U.S. Constitution; and (c) touch and concern the territory of the United States as described in detail throughout this Complaint and specifically in the Venue section herein.

2. Congress' express intent in enacting the ATS was to give non-citizens access to U.S. courts to hold U.S. citizens and foreign nationals like the Defendants named herein accountable for violations of international law norms, including the Law of Nations clause contained in the Constitution (Constitution Art. I Sec. 8 Cl. 10) that "touch and concern" (*See Kadic v. Karadzic*, 70 F.3d 232 at 233, rehearing denied, 74 F.3d 377. 17, (D.C. Cir.)) the United States, as Defendants' actions clearly do. For example, the entities named herein, loyal to Defendant Hifter, have been engaging in activity on U.S. soil for the past 5 years, which includes a vigorous lobbying campaign which it launched with President Trump. There are certain activities also concerning the organizing and planning

the wholesale takeover of Libya and numerous cities and villages which occurred in this District.

3. The Plaintiffs named herein have no potential remedies to exhaust in Libya because:

    a.  The remedies sought are not available in Libya. For example, the effectiveness of the court system has been severely compromised during the last 5 years.

    b.  The Plaintiffs are filing this suit in Federal District Court for another reason—the claims alleged herein cannot be adjudicated at the UN and Plaintiffs cannot file a claim in the International Court of Justice because only member countries can.

4. 28 U.S.C. § 1332 Diversity Jurisdiction is invoked with respect to all Defendants.

5. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

6. Fed. R. Civ. P. 4(k)(2) provides this Court personal jurisdiction over foreign defendants who have transacted any business in this judicial district pursuant to the District of Columbia Long-Arm Statute, D.C. Code Ann. § 13-423.

7. Amnesty International's Fourteen Principles on the Effective Exercise of Universal Jurisdiction lists grave breaches of the four Geneva Conventions as a basis for exercising universal jurisdiction by any national court like this Federal District Court. As detailed herein, all Defendants have been repeatedly breaching the Law of Nations (Constitution Art. I Sec. 8 Cl. 10) and Geneva Convention and Nuremburg Principles. Those breaches include: (a) willful extrajudicial killings (at least 11,637 Libyans); (b) torture or inhumane treatment; (c) willfully causing great suffering or serious injury to body or

health of Libyan civilians (bombing of medical facilities); (d) arms trafficking (buying thousands of M16's or Kalashnikovs); and (e) extensive destruction or appropriation of property not justified by military necessity.

8. Consistent with <u>Amnesty International's Principles on Jurisdiction</u>, a District Court in Jerusalem, Israel in 1961 decided the case of *Israel v. Eichmann*. *The court held regarding jurisdiction that the universal character of the crimes in question, war crimes, which are grave offenses against the Law of Nations itself, grant jurisdiction to any domestic court hearing such claims. See* Constitution Art. I Sec. 8 Cl. 10. There are detailed allegations pled herein reciting the "grave" offenses, financed, promoted, ordered by the Defendants, for example extra-judicial killings.

9. As already detailed in the introduction, all Defendants have violated international law convention principles and have provided material assistance to facilitate the perpetration of obvious war crimes. They purposely facilitated the commission of those war crimes, i.e. torture and extrajudicial killings, in order to advance Hifter's mission and personal agenda—take over all of Libya.

10. Defendant Hifter is a proper Defendant under the <u>Torture Victim Protection Act (Pub. L. No. 102-256, 106 Stat. 73 (1992)</u> (codified at 28 U.S.C. § 1350 Note) and was acting, when he waged an all-out war on Tripoli, "under actual authority." Defendant Hifter was appointed as the commander of the armed forces by the House of Representatives in eastern Libya and was in a unique position to inflict war crimes on the civilian Libyan population.

11. Defendant Hifter is a *de facto* ruler of Eastern Libya. He and his troops are in control of the political and economic affairs of most of Libya due to the brutal occupation of the country. The victims of Defendant Hifter's atrocities have no available legal protections

to seek accountability or reparations for the violations of various international law conventions in the state of Libya as it currently exists.

12. For the Court's edification, no victim, or a representative of a victim, has already or will attempt to file a claim against Defendants Hifter, Geroushi, Nayed and Al-Werfalli for violations of human rights law in the territory under their control which constitutes 90% of the Libyan territory. For the above reasons, Plaintiffs are seeking redress for war crimes through civil proceedings outside Libya.

13. Declaratory Judgment Act 28 U.S.C. § 2201- Creation of Remedy.

14. Foreign Sovereign Immunities Act, 28 U.S.C. § 1605-07 is invoked because UAE officials have been coming to this jurisdiction for at least 20 years to meet with DoD officials re: the purchase of sophisticated military hardware. As a result, they have engaged in "commercial activity," as defined in the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605-07.  Those military contracts included the provision and sale of sophisticated military aircraft and air defense radar systems which are the most sophisticated available. Based on information and belief, some of the UAE military hardware acquired pursuant to these contracts, including four Mi-24ps and an AT-8021 fixed wing aircraft were used to inflict extra-judicial killings on the Libyan civilian population and impose a reign of terror, all designed to bring about total control of the Libyan government by Defendant Hifter.

## VENUE

15.   Venue is proper in this judicial District Court based on 28 U.S.C. § 1391(f)(4). Venue is appropriate in this judicial district for a number of reasons:

a.  Hifter and his family routinely travel to America and sometimes this metropolitan area to meet with U.S. Congressional representatives or attend campaign fundraising events.  Hifter hired a lobbyist to solicit the U.S government and institutions for financial and military aid for his army.

b.  Hifter and his family have lived in Northern Virginia for approximately 20 years. Defendant Hifter owns a condominium in Falls Church, Virginia.

## PARTIES

**PLAINTIFFS:**

16. The Plaintiffs, Libyan citizens, bring this case under the ATS to redress the injuries that they have sustained as a result of the extrajudicial killings and attempted extrajudicial killings against the Defendants named herein, who killed, attempted to kill, conspired to kill and conspired to attempt to kill their relatives.

17. The Plaintiffs, whose sons were murdered, are Salem Maulud Aboulqaed, Khayri Alfaytouri Mohammed Nasrat, Misbah Abdullah Salim Nasrat, Salahedin Ali Abdulsalam Rahoma, Abdulhamid Alhadi Abdulhamid Bin Salih, and Riyadh Nathim Mohammed Alkhdhar who was gravely maimed.

**DEFENDANTS:**

18. Defendant Khalifa Hifter is a U.S. citizen residing in the state of Virginia. Defendant Hifter is the head of the Libyan National Army (LNA). He owns Unit 2310N, at 5505 Seminary Road, Falls Church, Va. 22041. Further, three of his U.S.-based sons' businesses, which were established in Virginia between 2014 and 2017, purchased 17 (seventeen) Virginia properties by cash between 2014 and 2017. At the time of the 17 Virginia property

purchases, the official business address was listed as Hifter's Seminary Road condo in Falls Church, Virginia.

19. Defendant Saqr Adam Geroushi is a Libyan citizen and Chief of Staff of the Libyan Air Force under the command of Defendant Hifter. Defendant Geroushi is responsible for ordering aerial attacks.

20. Defendant United Arab Emirates (UAE), senior officials working out of the embassy in Washington D.C. and the Permanent Mission at The United Nations, has been allegedly aiding and abetting Defendant Hifter and Defendant Geroushi in their war in Libya against their political opponents and the internationally recognized Government of National Accord (GNA) in Tripoli, the capital of Libya. The UAE has been allegedly accused of providing and operating drones in support of the Defendant Geroushi and the Libyan Air Force, which is a division of the LNA headed by Defendant Hifter.

21. Defendant Dr. Aref Ali Nayed is a Canadian and Libyan citizen and the ex-Libyan Ambassador to the UAE. Defendant Dr. Aref Ali Nayed is the owner of "Libyan TV," a Libyan television channel which broadcasts throughout Libya and on YouTube. His company, "Libya TV" promotes Defendant Hifter and the LNA in its broadcasts throughout the country. He uses his TV channel to foment discord against the Tripoli government. At all relevant times, Defendant Nayed knew what Defendant Hifter's agenda was, and supported him 100%.

22. Defendant Mohamoud Al-Werfalli is a Libyan citizen and is a high-ranking official in the LNA. He is a field commander in the Al-Saiqa Brigade and is directly responsible for ordering the commission of various war crimes, including extra judicial killings and torture.

**COMMON ALLEGATIONS**

23. After 20 years of residing in the U.S., Defendant Hifter departed his residency in the state of Virginia in the U.S. and headed back to Libya to participate and shape the future of the 2011 revolution. After 2014, as evidenced by Defendant Hifter's Valentine's Day televised coup, his mission was articulated as suspension of political entities for the takeover of Libya through the use of his army to rid Libya of those he labeled as "Islamists" of every hue and stripe.  In actuality, it has become evident that Defendant Hifter's foes were anyone in opposition to his stated mission. This mission was not impeded by war crimes committed by his army based on his videotaped orders or the destruction of infrastructure within cities or villages whose occupants resisted his mission.

## The UN Security Council and Libya

24. A United Nations Security Council Resolution number 1970 was issued in 2011. Paragraph nine of the 1970 Resolution was to impose an arms embargo on Libya and asked member states of the United Nations to adhere to the Resolution, which was their obligation.

25. A United Nations Security Council Committee was appointed to ensure the execution of Resolution 1970 (2011). The United Nations Security Council's Resolution 1973 (2011) established a Panel of Experts to Assist the United Nations Security Council Committee in carrying out its mandate.

26. The panel of experts issued annual reports regarding the situation in Libya and how the international community implemented the instructions of Resolution 1970 (2011).

27. On February 14, 2014, on Libyan state television, Defendant Hifter announced his intention to take control of the political institutions and called for the country's constitution, government and parliament to be suspended.

**Establishing the Libyan National Army**

28. After failing to seize power by force after his televised military coup in February 2014, Defendant Hifter launched what he called "Operation Dignity" in May 2014 to fight who he labeled as "Islamists."

29. Most of those who opposed "Operation Dignity" and Hifter's ambitions to control Libya were not "Islamists." Hundreds of military officers refused to join "Operation Dignity." Many of the said officers are defending the capital Tripoli against the Defendants attacks. Defendant Hifter was promoted to a "field marshal" by the parliament in the eastern part of Libya.  His current title is the General Commander of the Libyan National Army. He named his armed followers of the "LNA" which is a mix of military units, tribal, and neighborhood-based armed groups.

30. During the attack on Benghazi (second largest city in Libya) by Operation Dignity, Amnesty International accused the troops under the command of Defendant Hifter of committing "*serious human rights abuses and violations of international humanitarian law.*" *See* <u>Libya: Rule of the Gun</u>.

**Defendant Hifter and His Connection to the United States**

31. Defendant Hifter is a United States citizen and a resident of the state of Virginia where he owned property prior to 2011 when he departed for Libya. After 2014 when Defendant Hifter was able to exert his power and control over parts of Libya, the family, through one of his sons residing in Virginia, bought at least 17 properties in the USA.

32. Defendant Hifter has always had close contacts with the CIA and he has been working closely with American officials since his arrival in the United States in the early 1990s. He has kept in contact with Trump administration officials and promoted his efforts to engage

in extra-judicial killings as ongoing terrorism efforts- a complete fabrication. He has attempted to have a dialogue with White House national security advisor, John Bolton.

33. Bolton, in addition to President Trump, "left Hifter with the impression of a U.S. green light for an offensive on Tripoli by his forces, known as the LNA, according to three diplomats." After the success of Operation Dignity in controlling the cities of Benghazi and Derna (main two cities in the eastern part of Libya), with the help of the UAE, Egypt, Saudi Arabia and France, Defendant Hifter refused to accept and negotiate any peaceful solution in Libya to end the war.

34. On April 4, 2019, the forces under the command of Defendant Hifter launched an all-out war on the city of Tripoli where the internationally recognized government of Libya resides. On April 8, 2019, the World Health Organization's office in Libya reported the death of two physicians as a result of attack by the forces of the Defendant Hifter. As of October 25, 2019, the United Nations Support Mission in Libya (UNSML) condemned the attacks on civilian targets including medical facilities, field hospitals and health works. The UNSML confirmed the number of attacks during the year 2019 to be 56 attacks.   In November 18, 2019 Mr. Ghassan Salame, the head of UNSML, briefed the Security Council that the total estimated number of drones strikes in support of Libyan National Army forces is well above 800 since the beginning of the conflict.

35. In a press release issued August 25, 2019, UNSML announced that, since April 4, 2019 when Defendant Hifter, assisted by the UAE, launched a military attack on Tripoli, "more than 37 attacks have been registered against health workers and facilities, including hospitals, field hospitals and civilian and military ambulances." See UN Special Mission to Libya Press Release.

36. In reference to the military attack on the medical facility, subject of this Complaint, UNSML press release of August 15, 2019, stated "In late July, airstrikes conducted by the Libyan National Army targeted two field hospitals and two ambulances, killing at least four doctors and one paramedic and injuring at least eight other medical personnel."

### Extra Judicial Killings Are Commonplace

37. The <u>Human Rights Council of the United Nations</u> has taken notice of the fact that there should be some accountability for and prevention of intentional state killings of innocent civilians, human rights defenders, journalists, and prominent dissidents. The Special Rapporteur has focused on the legal and policy implications related to the responsibility to protect and the duty to warn those who are the subject of credible threats from state and non-state actors. The Special Rapporteur has proposed new United Nations mechanisms to strengthen accountability for and prevention of such arbitrary killings.

38. Recently, a number of UN delegates have approved six draft resolutions concerning extra-judicial executions, the right to peace, and the use of mercenaries. Among the most debated of those texts was one calling for an end to extra-judicial summary and arbitrary executions. At least 150 nations, including the U.S., have recognized that these executions can never be justified under any circumstances. The United Nations General Assembly, in response to these requests, mandated that all state actors and commanders of intervening military forces take effective and immediate action to eliminate all forms and manifestations of these practices.

39. Most civilized countries have recognized that an extra-judicial killing is the killing of a person by governmental authorities or individuals without the sanction or approval of any judicial proceeding or legal process. While extra-judicial killings often target leading

political trade union dissidents, religious, and social figures, *See Sinaltrainal v. Coca Cola Company* 578 Fed. 3d. 1252 (11th Cir. Fla. 2019) the Libyan nationals murdered by Defendant Hifter's LNA were ordinary citizens trying to eke out a living under very difficult circumstances.

40. International scholars have recognized that there are special circumstances that exist in particular countries that require a different definition of extra-judicial killing. That type of unlawful and deliberate killing is carried out "by agents of the state and under its order of acquiescence in lieu of arrest, investigation and prosecution." For the most part, the victims of these deliberate killings are dissidents. The proposed new definition, which would be applicable worldwide, includes "summary killing perpetrated by private individuals for purposes of carrying out on their own, or in the context of vigilantism, a campaign or policy of the state."

41. As stated earlier, the definition of extra-judicial killing encompasses any killing by government forces, *as well as any other killings by groups or individuals that the government fails to prosecute or investigate when they are in a position to do so*. The victims of the extra-judicial killings engaged in by Defendant Hifter and his lieutenants were Libyan nationals who were, *inter alia*, providing critical medical assistance to needy Libyans. They were not inserted into Libya to oppose or topple Defendant Hifter's military objectives. The reason that they were murdered was simple. Defendant Hifter and his trusted lieutenants perceived that any and all Libyan nationals who were not willing to join the LNA were his enemies and were opposed to his mission. Defendant Hifter and his lieutenants did not contemplate whether they were part of a medical group aiding civilians or not.

42. Based upon the <u>International Committee for the Red Cross manual</u>, and specifically what the rules of war were intended to accomplish, the Committee published the "Rules of War" aka international humanitarian law. Provisions contained in the <u>Rules of War</u> have application on our facts: (a) you are to protect those who are not fighting, such as civilians, medical personnel, or aid workers; (b) you must prohibit targeting civilians because doing so is a war crime; and (c) you must specify that medical workers, medical vehicles, and hospitals are dedicated to humanitarian work and, therefore, cannot be attacked.

43. As numerous international scholars have opined, "there is a need to firmly establish accountability and corresponding penalties especially if extra-judicial killings are carried out by the state or any of its agents. *Anyone who commits orders, assists, or has command responsibility for war crimes can be prosecuted in international courts*." Military commanders like Hifter, Al-Werfalli, and Geroushi are liable for the criminal conduct engaged in by their subordinates if they knew or should have known of the crimes and failed to take effective measures or hand over those responsible for prosecution to the appropriate authorities.

44. As alleged herein, at all relevant times, all of these Defendants knew or should have known of the war crimes which their subordinates were committing in Libyan territory under their control. International scholars are in agreement that "senior army commanders who do not act resolutely to stop gross violations in areas of their control and hold those responsible to account should face criminal prosecution.

**Defendant Geroushi**

45. Besides aiding and abetting other inhumane acts, Defendant Geroushi is also responsible for all air attacks launched by the LNA since he is the Chief of Staff of the Libyan Air

Force. Defendant Geroushi admitted in a television interview that he will commit war crimes when he feels disposed to unless his troops face a major shortage in ammunition. Defendant Geroushi stated that he will continue to attack civilian targets such as houses, electric power grids, telephone cables and water purification plants. Defendant Geroushi admitted that his forces received military aid from foreign states such as the UAE and Egypt. The admissions by Defendant Geroushi constitute violations of the UNSC Resolution (1970) and war crimes.

### Defendant Nayed, Ex-Libyan Ambassador to the UAE

46. Defendant Nayed is politically ambitious[1] and has used his platforms as a vocal supporter of Defendant Hifter's Tripoli campaign, referring to it as "post-liberation Tripoli" about the recognized government of Libya.[2] In addition, Defendant Nayed has used his TV station to foment discord against the UN-backed, Tripoli government. On April 22, 2019, Libya TV interviewed retired Major General Jalal al-A'bbadi, a Jordanian citizen. Major General al-A'bbadi called for the siege and cut-off of "water & electricity supplies" to Tripoli. What Maj General al-A'bbadi said on Libya TV is a clear call of incitement to commit a war crime against approximately 3 million residents of Greater Tripoli. Tripoli is currently under military attack since April 4, 2019 on the orders of Defendant Hifter.

47. Libya TV management failed to stop Major General al-A'bbadi from inciting war crimes during the interview.  Furthermore, Libya TV has never denounced the statements made by Major General al-A'bbadi.

---

[1] *See* "Trump Officials Meet With Libyan Politician Aligned With Opposition 'Strongman' In Potential Policy Shift" Defense One, November 21, 2019.
[2] Ibid.

48. In March 2017, Defendant Nayed appeared in Washington before the conservative Heritage Foundation, speaking in support of the overthrow of the UN recognized government in Tripoli. At that speech he openly criticized the government in Tripoli as not properly representing the people of Libya. In his address, he said, "To build a country you need people who are committed to the nation state…you cannot have partners in the building of a nation who don't believe in the state but only believe in being parasitic on it to build their transnational agenda."

49. In an email, Defendant Nayed told Defense One, "My two visits (to the USA) were to present the narrative of Libya's duly elected Parliament, its transitional government, and its Libyan National Army, and our reading of the current situation, as well as detailed plans for the formation of a National Unity Government, and holding general presidential elections within 18 months from the liberation of Tripoli." He also added, "The reception was attentive and positive, and we deeply appreciate it." [3]

50. Dr. Nayed has violated the UN Security Council Resolution 1970 Point 9 (2011), by facilitating the movement of the LNA's Special Purposes Vehicles (SPV) which were manufactured by Minerva Special Purpose Vehicles (MSPV), a company based in the UAE. The UN Panel of Experts contacted the MSPV to obtain information about the specific end-user of the vehicles. MSPV provided a document implicating Defendant Nayed, which indicates that the vehicles were destined to the Ministry of Interior of Libya. The December 18, 2014 document was issued by the Ministry of Interior of Libya to Defendant Nayed, the then Libyan ambassador to the UAE, urging him to intervene to expedite the process of sending the SPVs to Libya. The SPV's arrived in May 2015

[3]*See* "Trump Officials Meet With Libyan Politician Aligned With Opposition 'Strongman' In Potential Policy Shift" Defense One, November 21, 2019.

which was noted in ANNEX 29 of the UN Panel of Experts Report 2016, p. 142 and

144.[4]

## FIRST CAUSE OF ACTION

## DECLARATORY JUDGEMENT ACT  28 U.S.C. SECTION 2201. AWARD OF DECLARATORY RELIEF I.E., DEFENDANT HIFTER IS A WAR CRIMINAL

51. Plaintiffs hereby repeat and re-allege paragraphs 1 through 50 as if fully recited herein.

52.  Defendant Hifter has financed, approved, encouraged, and engaged in conduct which

constitute war crimes, i.e. crimes against humanity and extra-judicial killings. As a result,

there is abundant evidence, as detailed herein, that he should be deemed a war criminal.

53. Defendant Hifter has openly encouraged, participated in, or ordered that innocent Libyan

civilians be maimed and murdered, or be victims of extrajudicial killings. Armed conflict,

insecurity, and political divisions have plagued Libya since 2014 when General Hifter

declared war in Benghazi. Forces aligned with Hifter's LNA include neighborhood militias

and a militia known as the Avengers of Blood. They view Defendant Hifter as their "ruler"

to whom they owe "obedience."

54. In 2014, Defendant Hifter launched an assault on the city of Benghazi, known as

"Operation Dignity," killing thousands and injuring tens of thousands.

55. "Operation Dignity" was a military operation designed to fight so-called terrorist groups

in Benghazi including the Ansar al-Sharia, the February 17 Revolutionary Martyrs'

Brigade, the Rafallah Al-Sahati militia and the eastern Libya Shield brigade, which joined

---

[4] *See* "Letter dated 4 March 2016 from the Panel of Experts on Libya established pursuant to resolution 1973 (2011) addressed to the President of the Security Council" United Nations Security Council, March 9, 2016.

forces to form the Benghazi Revolutionaries Shura Council (the "BRSC").[5]   It was a

pretext, i.e. Defendant Hifter wanted to seize control of the eastern part of the country.

56. Armed groups loyal to Libyan National Forces (LNA) appear to have summarily executed

dozens of men in the LNA controlled town of Al-Abyar. On October 26, 2017, local police

forces discovered the bodies of 36 men, all of them executed, close to a main road southeast

of Al-Abyar, 50 kilometers east of Benghazi. Relatives of six of the victims told Human

Rights Watch investigators that men had been arrested on various dates by armed groups

loyal to the LNA in Benghazi. General Hifter ordered the military prosecutor of the Eastern

region to conduct an investigation. Needless to say, no investigation results have been

announced.

57. Relatives of other victims have stated on the record that their family members had been

arrested earlier in 2017 a couple of days before the bodies were found. They said their

relatives bore one or more gunshot wounds and their hands were tied behind their backs.

The relatives stated that when the victims were seized from their homes, not a single arrest

warrant was produced.

58. Human Rights Watch investigators spoke with relatives of the victims.   They were

photographed close up with their hands tied behind their backs in plastic handcuffs. Each

was lying in what appeared to be blood and had gunshot wounds in their head, neck and

face. Stephan Shmitt, a forensic investigator, stated unequivocally that the gunshot wounds

were consistent with gunshot wounds in pointblank range.

59. A typical confrontation between alleged terrorists living in Benghazi and LNA forces is

the example of the uniform fighters who attacked a young man, then proceed to kick him

---

[5] *See* ICC arrest Warrant for Al Werfalli issued on August 21, 2017.

and beat him with the butts of their weapons. His father demanded to know, "Who are you? Where are you taking him? What did he do?" The LNA soldiers said, "we are the army" and "we are from internal security." The next time his father saw his son, Ahmed, was when his photo showed up among the 36 dead in Al-Abyar. No surprise, a gunshot wound to the head and some torture marks were obvious. His brother said that he was a civilian and not a fighter and never participated in the 2011 revolution. He said that his greatest fear is, "in order to be able to live in Benghazi, you have to be a part of them (LNA) or else."

60. A typical explanation coming from a civilian in Benghazi – "My two brothers, Hatem and Imad, who are now both dead and missing were not fighters. No one in our family fights with Hifter or the LNA and now we are accused of being with Daesh (the Islamic State) and frustrating General Hifter's objectives in Benghazi."

61. At all relevant times, Defendant Hifter knew the consequence thereof--the violence would gradually escalate, including aerial bombings and frequent missile and/or mortar attacks. The intended result—more civilian deaths.

62.  In mid-October 2014 and in February 2016, General Hifter launched renewed military operations to oust the BRSC from the city of Benghazi.  The fighting between the LNA and the BRSC continued in Benghazi at least until March 2017.

63. In his role as Field Marshal of the LNA, the most senior position in the army, he has ordered the execution and mutilation of rival military leaders.  The body of a senior BRSC leader, Jalal Makhzoum, who was killed by the LNA, was exhumed and dragged through the streets of Benghazi. Further, his mutilated body was hung at the camp entrance of Al-Saiqa Brigade (Special Forces). The displayed body was used as a prop in photographs and in

videos of LNA soldiers that later appeared uploaded on social media accounts. This is classic extrajudicial killing, specifically prohibited by numerous international conventions.

64. On February 26, 2011, the United Nations Security Council, acting under Chapter VII of the Charter of the United Nations, unanimously adopted Resolution 1970 referring the situation in the Libyan Arab Jamahiriya since February 15, 2011 to the Prosecutor of the International Criminal Court ("Court"), and urging all States and concerned regional and other international organizations to cooperate fully with the Court and the Prosecutor.[6]

65. On August 15, 2017, the International Criminal Court issued an indictment of one of Hifter's trusted lieutenants, Defendant Al-Werfalli, who was a field commander in the notorious Al-Saiqa Brigade, for the murderous actions he performed in the furtherance of Operation Dignity.

66. The basis of Defendant Al-Werfalli's ICC indictment was substantiated video recordings, which have been posted online, starting in January 2017 that clearly show LNA fighters carrying out at least seven distinct, unlawful executions of "extremists." Three of the videos compiled by the international crowd-sourcing organization, Bellingcat show Al-Werfalli himself executing unarmed detainees[7]. In other videos, he gives order to men in military uniform to execute unarmed detainees. Al-Werfalli also gives orders and participates in the execution of another twenty unarmed, blindfolded prisoners in jumpsuits with their arms tied behind their backs.

67. According to the ICC indictment, "Mr. Al-Werfalli appears to be directly responsible for the killing of, in total, 33 persons in Benghazi or surrounding areas, between, on, or before

---

[6] S/RES/1970 (2011), para. 4.
[7] See "Geolocating Libya's Social Media Executioner," Bellingcat, September 4, 2017.

3 June 2016 and on or around 17 July 2017, either by personally killing them or by ordering their execution."

68. "The persons killed appear to have been detained and to have been either civilians or persons *hors de combat*. There is no information in the evidence to show that they have been afforded a trial by a legitimate court, whether military or otherwise, that would comport with any recognized standard of due process."

69. "The executions took place in the course of seven incidents, as described below, and were exceptionally cruel, dehumanizing and degrading."

Incident One

70. Mr Al-Werfalli is seen in a video footage to stand near a hooded, unidentified person, who is moving around an open dirt area with his arms in the air.[39] Mr Al-Werfalli is heard saying "Put your hands up! Put your hands up! Put your hands up!". After that, he shoots the hooded person with his left hand a number of times and the person falls on the ground. Mr Al-Werfalli approaches the body, shoots again the body on the ground for a number of times and states "You have been misled by he who did you harm. You have been misled by Satan". The video depicting this incident was posted on Facebook on 3 June 2016.[40]

Incident Two

71. Mr Al-Werfalli, wearing camouflage trousers and a black t-shirt with the logo of the Al-Saiqa Brigade, and carrying a weapon, is seen in a video footage shooting with his left hand three male figures in the head.[41] The three persons are kneeling in front of a wall with their arms tied behind their backs. After the bodies of the three men fall, Mr Al-Werfalli shoots at the bodies a few more times. Two of the victims are alleged to have been

revolutionaries in Benghazi.[42] The video depicting this incident was posted on social media on 20 March 2017.[43]

Incident Three

72. Mr Al-Werfalli, wearing camouflage trousers and a black t-shirt with the logo of the Al-Saiqa Brigade, and carrying a weapon, is seen in a video footage in a room, with others being present as well.[44]  He is standing next to an unidentified man in a white t-shirt, who is kneeling bare feet, with his hands behind his head. Mr Al- Werfalli shoots the person with his left hand in the head and continues to do so after the man falls down. The men around Mr Al-Werfalli cheer in approval and another unidentified man from the group comes forward and shoots the victim two more times. The videos depicting this incident were posted on social media on 7 and 8 May 2017.[45]

Incident Four

73. Mr Al-Werfalli is seen in a video footage in an outdoor setting together with two other men who carry weapons and whose heads are covered.[46] The three men stand behind two other men, who are dressed in camouflage and are kneeling bare feet on the ground. The two men are claimed to be, the first, a member of the BRSC,[47] and the second, possibly a member of Ansar al-Sharia.[48] The two men can be seen earlier in the video footage being detained in a cage.[49] Mr Al-Werfalli is seen walking away from the kneeling men, while the other two men with firearms walk towards them. Mr Al-Werfalli has his left hand in the air and sweeps it down towards the ground in a manner that suggests that he is ordering them to proceed with the execution. The two men shoot the kneeling persons who fall on the ground. The video depicting this incident was posted on social media on or about 22 May 2017.[50]

Incident Five

74. Mr Al-Werfalli, wearing a full camouflage uniform, is seen in a video footage in an outdoor setting together with five men wearing hoods and camouflage trousers and holding firearms.[51] Those five hooded, armed men stand behind four other hooded men, who are kneeling barefoot on the ground with their hands behind their backs. They point their firearms at each kneeling person's head. Mr Al-Werfalli raises his left hand in the air and sweeps it down towards the ground in a manner that suggests that he is ordering them to proceed with the execution. The five men shoot the four kneeling persons, who fall on the ground. The video depicting this incident was posted on social media on 9 June 2017.[52]

Incident Six

75.  Mr Al-Werfalli is seen in a video footage in an area of desert together with two other men who are holding firearms.[53] They stand behind two other persons, who are kneeling on the ground with their hands behind their back. Mr Al-Werfalli is seen speaking into the camera and then raising his left hand in the air and sweeping it down towards the ground in a manner that suggests that he is ordering the two men to proceed with the execution. The men shoot the persons kneeling, who fall on the ground. The video depicting this incident was posted on social media on 19 June 2017.[54]

Incident Seven

76. Mr Al-Werfalli, wearing a black cap, camouflage trousers and a black t-shirt bearing the logo of the Al-Saiqa Brigade, is seen in a video footage, together with two other persons wearing camouflage trousers, black t-shirts, and holding firearms.[55] Mr. Al-Werfalli is holding a white document from which he reads. He refers to the document as a "Decree decision" which "shall be executed today 17/07/2017".[56]  The video also depicts 18 persons

wearing orange jumpsuits and black hoods, with their hands tied behind their backs, kneeling bare feet on the ground, in four lines. After reading the document, Mr. Al-Werfalli says "Attention! The first group!" and then "Ready! Aim! Fire!"[57] As he does so, five men in camouflage uniform, hooded, and carrying firearms, walk from behind the group of kneeling persons to the front and position themselves behind the first line of five kneeling persons. They raise their firearms at them and shoot. The persons fall on the ground. One person in the second line also falls. The shooters then return behind the group of the other kneeling persons.

77. Then Mr. Al-Werfalli is recorded saying "The second group! Ready! Aim! Fire!" As he does so, five men walk again from behind the group and position themselves behind the second line of five kneeling persons. The person who has collapsed during the first shooting is pulled back to his knees by one of the men. The five men then raise their firearms and shoot the five kneeling persons, who fall on the ground. The shooters then return behind the group of the other kneeling persons.

78. When Mr. Al-Werfalli says "Attention! Attention, the third group!" and "Ready! Aim! Fire!"[59] five men walk again from behind the group, position themselves behind the third line of five kneeling persons, raise their weapons and shoot them. The persons fall on the ground and the shooters return behind the group of the remaining kneeling persons.

79. Mr. Al-Werfalli and the two other persons wearing camouflage trousers, black t-shirts, and holding firearms then walk behind the final line of three remaining kneeling persons. Mr. Al-Werfalli is seen to still hold the white document from which he has read earlier. Mr. Al-Werfalli and the other two men raise their firearms and shoot the three kneeling persons,

who fall on the ground. He and one of the other men fire some additional shots towards the persons on the ground before walking away.

80. In the same video, in a new segment, Mr. Al-Werfalli, wearing a black cap, camouflage trousers and a black t-shirt bearing the Al-Saiqa Brigade logo, is seen together with two men wearing orange jumpsuits and black hoods kneeling on the ground. One of the two kneeling men has his hands in front of him while the other has his hands on the back of his head. Mr. Al-Werfalli is holding a white document folded in his hand. He is recorded saying "Ready! Aim! Fire!" As he does so, two hooded men in camouflage, carrying firearms, walk forward, raise their weapons and shoot at the two kneeling persons, who fall on the ground. The men fire some additional shots at the victims before walking away.

81. The video depicting this incident, involving in total 20 executed persons, was posted on social media on July 23, 2017. The data indicates that the video may have been uploaded in the Benghazi area, in Libya.

82. On August 1, 2017, the Office of the Prosecutor ("Prosecution") filed an urgent application pursuant to article 58 of the Statute requesting the Chamber to issue a warrant of arrest for Mahmud Al-Werfalli.[8]

83. On August 15, 2017, the Chamber issued the Warrant of Arrest for Mr. Al-Werfalli's : "alleged criminal responsibility pursuant to article 25(3)(a) and (b) of the Statute, for the war crime of murder under article 8(2)(c)(i) of the Statute, in seven incidents against 33 persons as described in Section II, which took place from on or before 3 June 2016 until on or about 17 July 2017 in Benghazi or surrounding areas, in Libya."[9]

---

[8] *See* "Prosecution's urgent application under article 58 for a warrant of arrest against Mahmoud Mustafa Busayf AL-WERFALI," 1 August 2017, ICC-01/11-01/17-1-US-Exp.
[9] Pre-Trial Chamber I, "Warrant of Arrest", 15 August 2017, ICC-01/11-01/17-2, p. 16.

84. Defendant Hifter has refused to take any action based upon the warrant of arrest of his lieutenant, Mr. Al-Werfalli. In addition, Defendant Hifter has repeatedly violated UN Security Council Resolution 1970 because he has aided and abetted arms trafficking in and out of Libya to support extrajudicial killings and torture.

85. Defendant Hifter has also aided and abetted the commission of these war crimes through his command of "Operation Dignity" which led to dozens of killings as already detailed herein at the hands of forces under the command of Defendant Al-Werfalli, his trusted Lieutenant and a fellow war criminal.

86. Arms trafficking can broadly be defined as the illicit trade of contraband, small arms and ammunition, which constitutes part of a broad range of illegal activities often associated with transnational organizations.

87. Defendant Hifter has also violated the Law of Nations Clause in the U.S. Constitution by aiding and abetting inhumane acts. *The following acts are prohibited by the Law of Nations: "divine self-determination of a civilian population, murder/disappearances, torture, war crimes, and crimes against humanity.*"

88. Defendant Hifter has participated in, authorized, delegated, or directed his army personnel to perform some of these acts. For example, he ordered the unlawful kidnapping and torture of Libyans in LNA-controlled territory.  These Libyans were held as prisoners in a "secret section of the Qarnadah prison" where they are beaten and psychologically tortured. Qarnadah prison is under direct control of Defendant Hifter. This conduct is only one example of how Defendant Hifter terrorized the civilian population in Libya.

89. As such, Defendant Hifter has violated a number of fundamental concepts included in numerous international conventions. A country or individual cannot engage in a pattern of

extrajudicial killings or torture which endangers the mental or physical health of a civilian population. Defendant Hifter has done this by repeatedly bombing medical facilities, putting the civilian population in constant fear that they will be murdered in a similar manner.

90. As a result of his campaign of terror, 11,637 Libyan individuals have been killed, 9,497 Libyan individuals have been wounded and 300,000 Libyan civilians have been forced to abandon their homes.

91. Defendant Hifter does not support a Libyan democracy as expressed in an interview with Jeune Afrique in 2018 "Khalifa Haftar: « La Libye n'est pas encore mûre pour la démocratie »." Translated, it means according Defendant Hifter, "Libya is not ripe for democracy."[10] Defendant Hifter is a self-serving, budding military autocrat who has demonstrated a willingness to murder, maim, ethnically cleanse, or forcibly displace any Libyan in his pursuit to overthrow Libya's internationally recognized government.

92. In this pursuit, Defendant Hifter has violated 10 international conventions, a number of UN Resolutions, and has committed several war crimes by ordering that innocent Libyan civilians can and should be tortured and murdered. His rationale is simple, i.e. these alleged terrorists must be, as Defendant Hifter stated in 2015, "in the ground, in prison, or out of the country."

93. At all relevant times, Defendant Hifter knew exactly what kind of activity senior army personnel would engage in to comply with his instructions, e.g. mobile firing squads that are employed all over Libya when and if necessary.

---

[10] *See* "Veteran commander vies for power in Libya's shifting sands," Reuters, February 26, 2018.

94. In an effort to intimidate the Libyan civilian population, *See* 18 U.S.C. § 2339 (C), on a number of occasions, General Hifter has admitted what the limited menu of options is for the civilian population. In no uncertain terms, he remarked that the civilian population can end up "in the ground," i.e. they have been murdered by a firing squad. Or, they could end up in prison and be tortured and incarcerated for the rest of their lives. Or, they could be forcibly expelled from the country to make sure they cannot foment any type of rebellion against the Hifter regime on Libyan soil.

WHEREFORE, Plaintiffs hereby request that the Court, based on the Declaratory Judgement Act 28 U.S.C. § 2201, declare that Defendant Hifter is a war criminal and enter judgment against Defendant Hifter in the sum of $1 billion.

## SECOND CAUSE OF ACTION

### UNIDENTIFIED SENIOR UAE OFFICIALS HAVE CONSPIRED WITH DEFENDANTS HIFTER, NAYED, AL-WERFALLI AND AIR FORCE CHIEF GEROUSHI TO INITIATE A CAMPAIGN OF TERROR ON LIBYAN SOIL, INCLUDING TORTURE AND EXTRAJUDICIAL KILLINGS WHICH VIOLATES NUMEROUS INTERNATIONAL CONVENTIONS

95. Plaintiffs hereby repeat and re-allege paragraphs 1 through 94 as if fully recited herein.

96. As has been alleged in various causes of action listed herein, Defendants Hifter and Al-Werfalli engaged in arms trafficking, intentional infliction of emotional distress, inhumane acts against a civilian population, and the arrest and torture of civilians in an effort to rid Libya of all Libyans who opposed their agenda. Based upon that pattern of extensive criminal activity on Libyan soil, both Defendants Hifter and Al-Werfalli have violated a number of international conventions.

97. Defendants Hifter and Al-Werfalli, Nayed and Geroushi and their Libyan National Army could not a have accomplished these horrible feats without the extensive encouragement,

support and financial backing of the UAE government (or of officials in the UAE government).

98. The UAE has been a strong supporter of Defendant Hifter and Defendant Geroushi. It had provided financial, military and political support to Operation Dignity and its soldiers. The UAE had held various meetings to support and ensure that Defendant Hifter would secure a position in the decision-making process in a future Libya. Accomplishing such target, Defendant Hifter will serve the interest of the UAE in Libya and the region of North Africa.

99. The UAE government made numerous public statements concerning Libya, including supporting the UN initiative and the UN resolution barring arms trafficking. At no time did the UAE leadership approve of arms trafficking, extrajudicial killings, torture, or frustrating the UN initiative. But at the same time, these officials were working with Hifter's senior colleagues to destabilize the UN-backed government and spread a campaign of terror in Libya. Since these officials were acting outside the scope of their employment, they can be named herein in their individual capacity.

100. At all relevant times herein, these officials were tasked with monitoring the activities going on in Libya for good reason, i.e. what happens in Libya affects the entire Gulf region including the UAE. Instead of monitoring the situation in Libya, these officials: (a) lined up mercenaries to enter Libya and frustrate UN objectives; (b) paid for the introduction of drones; (c) coordinated LNA activities re commission of extrajudicial killings and torture; and (d) facilitated arms trafficking to further destabilize the nascent UN-backed government. These officials were pursuing their own personal agenda, i.e., taking cash bribes.

101. The UAE involvement in Libya is not conducted by individuals or private companies. It is conducted by the top UAE government officials as it was admitted by high ranking officials of the UAE Ministry of Foreign Affairs that *"the Libya file is being managed at the level higher than MOFA" (i.e. head of state level)*.

102. This admission was published by UN Panel of Experts in a series of leaked emails in the 2016 report on Libya by United Nations Security Council. In "Annex 30 Leaked UAE emails, Email Chain apparently leaked from the UAE Ministry of Foreign Affairs" the emails discuss the Ministry of Foreign Affairs acknowledgement that the UAE has violated the UNSC Resolution 1970 (2011). Further, the email chain has detailed the order to institute a cover-up to the UN Panel of Experts.

103. The August 3, 2015 email chain demonstrates the acknowledgment that the UAE has violated UNSC 1970 (2011) and that violation is ongoing: "The fact of the matter is that the UAE violated the Security Council and continues to do so."  Further, the orders of the decision makers at "a very high level" in the UAE to MoFA are intended to be deceptive "to provide a cover to lessen the damage as much as possible" to the UN Panel of Experts. From Permanent Mission of the UAE to the United Nations between Ahmed (redacted) @mofa.gov.ae to Iana Nusseibeh (redacted) @mofa.gov.ae under the "Subject: FWD: Communications from the Libya Panel of Experts".

> *"Dear Iana, I think we should be slightly careful in replying to the Libya Panel.  The fact of the matter is that the UAE violated the Security Council and continues to do so.  After speaking with a number of people both in and outside of the MoFA, the Libya file is being managed at a level higher than MoFA (ie head of state level).*
>
> *By replying to the panel directly, we indicated that we have acknowledged that we received the letter, and since we will not have a response that would indicated that we are deliberately*

*ignoring the request.  The correspondence for the Libya Panel in particular needs to be carefully managed. I believe that the Libya Panel is looking for as much evidence against the UAE to mention in the report.*

*When the panel visited the UAE 2 years ago and met with mahash's Deputy in MOFA to obtain information on Libya, upon returning to new York, the clearly mentioned that the UAE provided them with information that proves that we violated the Security Council resolution.  Recall Laura and I wrote a paper for AMG, specifically on how to deal with the Libya sanctions experts.*

*On the paper which we wrote talks about how we should carefully manage our engagement with the Libya Panel and should be careful with which information to provide them since most of the information is currently not in our favour…*

*…If we are to do this in the "right way" the (UN way), we are supposed to send a request letter to the Security Council, asking for approval each time we send a shipment to Libya.  This of course will expose how deeply we are involved in Libya.  And will also hinder our interests in Libya…Hope this email explains the dynamics of the Libya situation.  I have forwarded the request again to the UAE and I expect the same response which was: the situation is being managed at a very high level and we should try to provide a cover to lessen the damage as much as possible."*

104. The fact that UAE "head of state level" was personally involved in providing assistance to Defendant Hifter's Operation Dignity, even with the UNSC Resolution 1970 (2011) in place, was confirmed by the President of the Libyan parliament known as the House of Representatives. President Aqilah Saleh confirmed "'brotherly' support given by the UAE to Haftar's forces in 2014" in a video interview aired on a Libyan TV channel and published in Middle East Eye and that the head of state level personally assisted Defendant Hifter[11]. "Literally, Sheikh Muhammad bin Zayed said in the first meeting: 'What is ours is yours'.

---

[11] *See* "UAE provided military aid for Haftar, says Libyan politician," Middle East Eye, April 27, 2017.

He meant to say our wealth is your wealth. They did not spare an effort in supporting us despite the pressure."[12]

105. The UAE government illegally provided supplies and equipment to Hifter and Al-Werfalli's military forces, including attack helicopters, fixed-wing aircrafts, armored personnel carriers, and other armed and non-armored vehicles.

106. The helicopters used in the campaign were traced to Belarus, and Belarus confirmed that the Mi-24ps helicopter had been transferred to the UAE in 2014, as part of a delivery of four Mi-24ps. Belarus had issued an end-user certificate and registered the transfer in the United Nations Register of Conventional Arms of 2015. Belarus never received a request by the UAE for the authorization of re-export of helicopters. The UAE has failed to provide further details on the transfer of attack helicopters.

107. Defendant Hifter, with the aid of UAE airpower, intentionally targeted medical facilities, medical personnel and medical transportation. In a press release issued October 25, 2019, the UNSML announced "*the United Nations has documented at least 68 attacks on health workers and health facilities in 2019, as of October 25.*"

108. Drones provided by UAE officials discussed herein and ordered by Defendant Hifter and operated by Defendant UAE, attacked two ambulances belonging to Az-Zawiyah Field Hospital near the airport road in Tripoli killing one paramedic, Plaintiff Bin Salih, while wounding three others. The attack occurred on May 23, 2019.

109. On July 27, 2019, the Defendants conducted another drone attack on Az-Zawiyah Field Hospital building near the airport road in Tripoli, killing two physicians and three

---

[12] Ibid.

paramedics, Plaintiffs Aboulqaed, Muath Nasrat, Aws Nasrat, Abdulsalam, while wounding eight other individuals, including Plaintiff Alakhdar.

110. The acts of the Defendants Hifter, Al-Werfalli, Nayed, Geroushi, and the UAE directly and proximately caused the extrajudicial killing of Plaintiffs Aboulqaed, Aws Nasrat, Muath Nasrat, Abdulsalam, Bin Salih, and attempted killing of Plaintiff Alkhdar when they orchestrated the attack on two field hospitals on July 27, 2019 using drones provided by UAE.

111. Photographic evidence shows that the LNA received an AT-802i fixed-wing aircraft from the UAE, which was purchased from the U.S.-based company, Iomax USA Inc.

112. Defendant UAE provided armed vehicles to the LNA in Tubruq in 2017, consisting of 98 armed personnel carriers and 549 armed and non-armed vehicles.  The UAE shipped these aircrafts and vehicles on a Saudi, state-owned vessel, Bahri Abha, which left from the Jebel Ali port in the UAE and docked in Tubruq, Libya on April 17, 2019. Saudi Arabia confirmed the UAE's shipment to Tubruq.

113. According to Jane's 360, Defendant Hifter's forces are in possession of Raytheon Javelin anti-tank missiles.  Despite France's claim of ownership of the Javelins recovered from Defendant Hifter's retreating battle line, Jane's 360 reporting confirms that the Javelin's ownership is not France because the Javelin's production lot numbers make it easy to track, which confirms that the recipient was the UAE.

> "The Javelin containers were marked with a contract number (W31P4Q-04-C-0136) that covered a July 2008 order for USD103 million worth of Javelin missiles, launchers, and support equipment for the UAE and Oman. The only other deliveries covered by that contract appear to have gone to the US military. The containers also had production lot numbers that should make it easy to track the recipients."[13]

---

[13] *See* "UAE distances itself from munitions found in Libya," Jane's, July 3, 2019.

114. According to BBC, officials are working to confirm that a UAE fighter jets launched the missile strike on a migrant detention center in July 2019, which killed 53 migrants and injured 130.

115. According to Amnesty International, the LNA uses Chinese-manufactured drones operated by the United Arab Emirates (UAE). The deployment and use of these weapons constitute a violation of a UN arms embargo, in UNSC Resolution 1970 which has been in place since 2011, and all states should abide by their obligations and enforce the sanction.

116. As this Court is probably aware, there are numerous statutes, domestic and international, that explain the concept of war crimes. One concept that Americans hold near and dear is the "Law of Nations" doctrine which appears in the U.S. Constitution. That is the only International Convention that appears in the Constitution. All of the criminal activities engaged in by Defendants Hifter, Air Force Chief Geroushi, Nayed and Al-Werfalli, with the encouragement and support of UAE officials, herein have violated the Law of Nations clause directly or indirectly.

117. Inhumane acts are further defined as actions of a character similar to murder, extermination, enslavement, deportation, imprisonment, torture, sexual violence, persecution against any identifiable group, or enforced disappearance. Defendant Hifter's, Geroushi's and Al-Werfalli's forces engage in these inhumane acts daily in Libya, frequently using assets acquired from the UAE officials discussed herein. *See* U.S. Department of State, Bureau of Democracy, Human Rights and Labor, "Libya Human Rights Report 2018" (2018).

118. These inhumane incidents have been made possible in part because of the UAE government officials' role in the campaign of terror launched by Defendants Hifter, Geroushi, Nayed and Al-Werfalli.

119. As referenced in the heading of this cause of action, there are UAE officials that are yet to be identified who conspired with Defendants Hifter, Geroushi, Nayed and Al-Werfalli to initiate this campaign of extrajudicial killings and torture. The evidence of these UAE officials' intentional and malicious actions against the Libyan people is extensive.

    a.   The UAE had held various meetings to support and ensure that Defendant Hifter would secure a position in the decision-making process in future Libya. Accomplishing such target, Defendant Hifter will serve the interest of the UAE in Libya and the region of North Africa.

    b.   Defendant Geroushi has admitted, in a televised interview, that his forces received military aid from foreign states such as the UAE and Egypt. The admissions by Defendant Geroushi constitute violations of the Security Council Resolution (1970) and war crimes.

    c.   In its Final Report for year 2015, the UNSC Panel of Experts on Libya mentioned that it obtained information regarding the illicit export of firearms produced in the United Arab Emirates to Libya in 2013, without informing the Security Council Committee concerning Libya. *"Following a request for information, the United Arab Emirates provided the Panel with copies of relevant documentation, proving that the violation took place."*

    d.   In its Final Report for year 2016, the UNSC Panel of Experts on Libya mentioned *that transfers and potential transfers of materiel originated from the UAE.*

e.   In its Final Report for year 2017, the UNSC Panel of Experts on Libya cites a report by IHS Jane's Defense Weekly stating that the UAE operates an airbase in Libya.

f.   The 2019 Final issued by the UNSC Panel of Experts on Libya show how the UAE refused to cooperate with the said Panel and answer its inquiry regarding the arms embargo on Libya. The Panel sent ten letters requesting information and received two replies in return.

g.   UAE officials engaged in various conduct to aid and abet Defendants Hifter, Geroushi, Nayed and Al-Werfalli in their campaign of terror. They intentionally disregarded the 1970 (2011) UN Resolution calling for a ban of any and all arms shipments into Libya. They provided air cover for forces controlled by Defendants Hifter, Geroushi, Nayed and Al-Werfalli.

h.   They allowed Hifter, Geroushi and Al-Werfalli's military forces to use various military facilities in Tubruq. They assisted Hifter, Geroushi and Al-Werfalli by informing the military forces under their control of the exact location of any and all medical facilities located in Libya.

120. In summary, the reports submitted by the UNSC Panel of Experts on Libya show clearly that the UAE had violated the arms embargo on Libya and provided armored vehicles, drones, and aircraft. The UAE also operated an airbase providing technical support. All military equipment supplied by the UAE in violation of the UNSC Resolution 1970 imposing arms embargo were given to the LNA headed by Defendant Hifter.

121. At all relevant times, these officials knew what the consequence would be for sharing this sensitive information with Defendants Hifter's, Geroushi's, Nayed's and Al-Werfalli's military forces, i.e. innocent civilians (medical professionals) would be slaughtered. They

also supplied these military forces with sophisticated drones which were used in the attack on the medical facility that is described in the section "Common Allegations." They also supplied Defendants Hifter and Al-Werfalli with the local currency necessary to pay the salaries of soldiers working in Libya to destroy villages, hospitals, schools, cities and commit other acts in furtherance of the campaign of terror initiated by Defendants Hifter, Geroushi, Nayed and Al-Werfalli.

122. In addition, according "western diplomat" interviewed in a July 19, 2017 Reuters report, the UAE was highlighted as one of countries that provide the money for bribes given to Eastern tribes to secure loyalty to Defendant Hifter's Operation Dignity. Reuters noted "Progress was achieved largely by winning over local tribes and armed groups – a technique Haftar is said to be seeking to emulate further west. A similar process is going on in Tripolitania on the coast, a really intense series of conversations," said one Western diplomat, speaking on condition of anonymity and referring to the capital and surrounding region. He explained, "The intent is absolutely there, but he's trying to gauge when it's possible."[14]

123. The western diplomat noted the intent was to replicate the same system of bribes to Western tribes to advance Defendant Hifter's move westward to take Tripoli.

> *"Winning Tripoli may depend on access to funding to gain backing from the capital's fickle armed groups, some of which fiercely oppose Haftar. "There is recognition that he needs a lot more money," said the Western diplomat. "He's looking for a chunk of cash for securing loyalties in Tripoli." That in turn may depend on foreign support, which Haftar has so far received primarily from Egypt and the United Arab Emirates. More recently, he has developed closer ties with Russia."[15]*

---

[14] *See* "After long Benghazi campaign, Libyan commander eyes capital," Reuters, July 19, 2017.
[15] *See* "After long Benghazi campaign, Libyan commander eyes capital," Reuters, July 19, 2017.

124. Confirmation that the UAE has funded the bribes to Libyan tribes is written in an April 6, 2019 memo from a Wagner Group affiliated fund.  This memo on securing loyalties of western tribes was written two days after the commencement of Defendant Hifter's  April 4, 2019 campaign. According to the Daily Beast report, the Wagner Group published internal memos titled "Briefing on the situation in Libya as of 06/04/2019, 9:00.  The memos stated, "This document was written by Pyotr Bychkov, an employee of the Prigozhin-linked Fund for the Defense of National Values, on April 6, 2019."[16] Pyotr Bychkov (of Prigozhin-linked Fund for the Defense of National Values) stated that Defendant Hifter consolidated territory by bribing tribal leaders and officials using a total of around $150 million provided by the UAE.

> "Before the operation to assault Tripoli, during the so-called "cleansing terrorists from the south of Libya," **the LNA had engaged in no real clashes**, while **issues of controlling territory had been decided by means of extortion and buying the loyalty of tribal leaders and local officials** using funds provided by the UAE. According to expert data, around $150 million was doled out for these purposes, not considering the upkeep of the army and other rolling costs."[17]

125. Leaked documents that were published on letterhead of the Embassy of the UAE Khartoum (Sudan) show that the movements of Sudanese mercenaries to Libya were with the assistance of the UAE. Translation:

> "Al Jazeera Net has obtained special documents and information that reveal the UAE's use of the Sudanese airspace to transport hundreds of mercenaries - who were recruited by Muhammad Hamdan Daglo (Hemedti), Vice-Chairman of the Military Council in Sudan, from the Arab tribes in Darfur and some neighboring African countries, to Libya and Yemen via Eritrea. She also obtained other special information that reveals the nature of the recruitment of Hemedti (the commander of the

---

[16] *See* "Possible motives for K. Haftar's visit to Russia,' The Interpreter, September 12, 2019.
[17] Ibid.

> *Rapid Support Forces) hundreds of mercenaries for the Emirates from the Arab tribes in Darfur."[18]*

126.  According to The Global and Mail reporting, Vice-Chairman of the Military Council in Sudan's FARA-registered lobbyist, Ari Ben-Menashe "*acknowledged that Sudan may have sent troops to Libya. 'The Sudanese had troops that were pulled out of Yemen, and possibly some of these troops were sent by the (United Arab Emirates) to Libya,' he said.*"

> The Global and Mail article quoted the UN Panel of experts referring to Hemedti's mercenaries: *"The UN panel of experts, however, cites several sources confirming that about 1,000 Sudanese RSF troops were deployed to Libya by their commander, Gen. Dagalo, on July 25. "The initial plan was that the Sudanese troops would guard critical national infrastructure, thereby freeing up HAF troops (Mr. Haftar's forces) for offensive operations," the report said. It said the Sudanese authorities and Gen. Dagalo are both violating the UN arms embargo of Libya."[19]*

127. It is evident that the UAE went beyond its own borders by supplying arms to Defendant Hifter and attacking civilian targets in Libya which affected Libyan territorial sovereignty. Attacking medical facilities and medical personnel is contrary to international law and constitutes war crimes.

128. Immunity from lawsuits should not be a defense for the UAE when it, knowingly and intentionally encouraged and made it possible for Defendants Hifter, Geroushi, Nayed, and Al-Werfalli to commit extrajudicial killings and other serious international crimes in violation of the Laws of Nations clause in the U.S. Constitution.

---

[18] *See* "Emirati military aircraft using Sudan's airports and Hamidati recruiting mercenaries for Abu Dhabi," Al Jazeera, July 24, 2019.
[19] *See* "UN probing Montreal lobbying firm's possible role in Sudanese troop deployment in Libya," The Globe and Mail, December 15, 2019.

129. The UAE had acted in violation of international law by disregarding Libya's sovereignty at time of peace since there was no war between Libya and the UAE. For example, it committed crimes against peace, which violates Principle VI of the Nuremburg Principles.

130. The UAE should not benefit from immunity in respect to acts causing death and personal injury in Libya, especially if such acts are in violation of international law.

131. The Plaintiffs listed herein in the "Parties" section constitute only a small fraction of the Libyan civilian population that has been victimized by the campaign of terror described herein. They are, in effect, a representative sample.

WHEREFORE, Plaintiffs request a reward of $1 billion against Defendants UAE officials, Defendant Hifter, Defendant Al-Werfalli, Defendant Nayed, and Defendant Geroushi for initiating, supporting and maintaining a campaign of terror, including extrajudicial killings and torture as described herein and as referenced in other causes of action. This behavior is of such an egregious nature and violates numerous international conventions that this Court should consider an award of punitive damages so that Defendant UAE officials are punished accordingly for depriving innocent civilians of fundamental human rights laid out in the Universal Declaration of Human Rights.

## THIRD CAUSE OF ACTION

## EXTRAJUDICIAL KILLINGS OF LIBYAN CIVILIANS

132. Plaintiffs hereby repeat and re-allege and incorporate by reference the allegations set forth in proceeding paragraphs 1 through 131.

133. As detailed herein, there are numerous classes of Libyan nationals who have been victimized by extra-judicial killings, sanctioned, authorized, sponsored, or financed by Defendant Hifter and his lieutenant Al-Werfalli. Those classes include, but are not limited

to: (a) the four doctors murdered during airstrike on the medical facility; (b) the victims of Benghazi; (c) the 900 Libyan individuals murdered in siege of Tripoli; and (d) the victims murdered in the seven incidents videos cited by the ICJ.

134. There are a number of medical personnel who have been murdered by the Defendants named herein, including Dr. Fathi Salim Mawloud Aboulqaed. The Defendants have either engaged in covert activity to murder these individuals or have aided and abetted in the murder of these individuals by assisting the war criminals responsible wherefore.

135. The murder of Dr. Fathi Salim Mawloud Aboulqaed constitutes an "extrajudicial killing." Moreover, that extrajudicial killing and the others described herein constitute a violation of the Fourth Geneva Convention, the Law of Nations clause in the U.S. Constitution, President Lincoln's 1863 Lieber code (the first war crimes statute) and has been condemned by the U.S. State Department on numerous occasions.

136. The extrajudicial killings described in the first cause of action also include the murder of Aws Khayri Alfaytouri Nasrat, Muath Misbah Abdullah Nasrat, Mohammed Salahedin Ali Abdulsalam, and Abraheem Ali Alhadi Bin Salih, which were inflicted deliberately and intentionally for purposes that include, *inter alia*, punishing and intimidating medical personnel from performing their work and providing medical assistance to the members of the military unit who were striving to protect them.

137. Defendants Hifter, Geroushi, Nayed, Al-Werfalli and various UAE officials, whose names will be identified through discovery herein, directly and proximately caused the extrajudicial killings of these Plaintiffs and caused their families immense pain and suffering.

138. Under Libyan law, Plaintiff Salem Maulud Aboulqaed is heir at law of his son Dr. Fathi Salim Mawloud Aboulqaed and is entitled to any awarded damages made herein. Since the Defendants acts were deliberate willful, wanton, malicious, oppressive and reckless, they should be punished by an award of punitive damages in the amount to be determined by this Court after the close of evidence herein.

139. In a video, during a meeting with his subordinates, Defendant Hifter ordered his troops not to take any prisoner by saying "Never mind consideration of bringing a prisoner here. There is no prison here. The field is the field, end of the story." In another video, Defendant Hifter calls for continuation of the siege of the City of Derna, with a population of over 100,000. The siege lasted for three years and ended with an invasion and destruction of the center of the city in May 2018.

140. In the video mentioned above, Defendant Hifter calls upon his soldiers not to allow civilians to leave the city to seek medical treatment or students to join other educational institution outside the city.  The full transcript of the video states:

> *"The issue of the blockade, my brothers, is not a joke; when we say a blockade, it means a blockade, (inaudible), or say things which are messed up, or he is incapable of doing so and so. This is not acceptable to us, then someone answers him back saying a blockade is a blockade.  None of that.  None of that.  The blockade means choking (or strangling). There is no medicine, there is no medical care, or I don't know what, no petrol, no (cooking) oil. These issues, my brothers, we talk about them clearly.  We have shut down everything until we get to a point where there is no longer a solution at all".*

WHEREFORE, Plaintiffs named herein hereby request that the Court enter judgement against each Defendant named herein in the sum of $1 billion.

## FOURTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY DEFENDANTS HIFTER, GEROUSHI, NAYED, AL-WERFALLI AND OFFICIALS OF THE UAE

141. Plaintiffs hereby repeat and re-allege paragraphs 1 through 140 as fully recited herein.

142. Under the laws of the District of Columbia, intentional infliction of emotional distress (IIED) consists of "(1) 'extreme and outrageous' conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff 'severe emotional distress.'" *Sere v. Group Hospitalization, Inc.,* 443 A.2d at 37 (D.D.C. 1982) (citations omitted). Intent or recklessness can be inferred from the outrageousness of the acts. *Id.; Anderson v. Prease,* 445 A.2d 612, 613 (D.C.1982).

143. The Restatement (Second) of Torts recites that conduct which otherwise may seem "reasonable" becomes tortious "when directed at an individual known to be particularly susceptible to infliction of emotional distress." Restatement § 46, Comment F, Illustrations 9-11 (1965); *Boyle*, 392 N.E. at 1056.

144. Generally, a case of intentional infliction of emotional distress is made out only if "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Restatement, *supra,* § 46 comment d. *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. App. 1998), amended, 720 A.2d 1152 (D.C. App. 1998).

145. The U.S. District Court for the District of Columbia held that families of victims of terrorism can properly plead claims for Intentional Infliction of Emotional Distress. In a case involving the family members of victims of the Khobar Towers bombing in 1966, the court declared : "[T]o collect for intentional infliction of emotional distress in cases such as this one, the plaintiff need not be present at the place of outrageous conduct, but must be a member of the victim's immediate family…Furthermore…the Court, consistent with

the above-quoted reasoning in *Salazar*[20], here extends the suspension of the presence requirement to terrorism exception cases generally." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20 (D.D.C. 2009)

146. As is specifically detailed in the Complaint, Defendants Hifter, Geroushi, Nayed, Al-Werfalli and the officials of the UAE have placed the Plaintiffs and their families in extreme emotional distress.

147. Plaintiffs are medical personnel, working at field hospital or in ambulances enroute to field hospitals. As this Court knows, under the Geneva Convention and other established modern rules of warfare, hospitals, ambulances and aid stations in war zones and everywhere else are considered non-combatant areas.

148. In the twisted interest of their own personal criminal motives, the Defendants deliberately, recklessly, and negligently ignored international norms which declare hospitals and medical facilities to be sacrosanct and protected from attack. As such, the Defendants herein, deliberately, negligently, and intentionally used their forces to attack the medical facilities, causing the death and serious injury of the Plaintiffs in this case— and dozens of others.

149. They did this knowing, not only that those inside the facilities, and ambulances, would be violently killed, but that their families would be emotionally scarred for life.

150. The result of the attacks and the murders of these Samaritan rescue medical personnel was the notification every family member dreads—that a loved one has been killed or seriously wounded. This was particularly impactful in the case of these Plaintiffs, all of whom are dedicated, non-combatant, medical professionals. The families understood the non-

---

[20] *See Salazar v. Republic of Iran*, 370 F. Supp. 2d 105 (D.D.C. 2005)

combatant nature of the medical facilities and never expected to learn that their loved ones were in any danger.

151. Based upon the allegations herein, the Plaintiffs have suffered severe emotional distress at the hands of the Defendants Hifter, Geroushi, Nayed, and Al-Werfalli and the officials of the UAE and their agents.

WHEREFORE, Plaintiffs ask this Court to enter an award in the amount of $1 billion in damages against all Defendants for Intentional Infliction of Emotional Distress.


*/s/ Martin F. McMahon*
Martin F. McMahon, Esquire
Martin McMahon & Associates
1717 K St. NW, Suite 900
Washington D.C. 20006
202-862-4343
*Counsel for Plaintiffs.*